BRIAN J. MOONEY (SBN: 143795)
bmooney@gordonrees.com
EDWARD FITZGERALD (SBN: 227218)
efitzgerald@gordonrees.com
GORDON & REES LLP
275 Battery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 986-5900
Facsimile: (415) 986-8054

Attorneys for Defendant
ABBOTT LABORATORIES INC. and
ABBOTT LABORATORIES

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHIMRIT VAVAK, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ABBOTT LABORATORIES, INC. d/b/a ABBOTT SALES, MARKETING and DISTRIBUTION CO., a Delaware corporation, and ABBOTT LABORATORIES d/b/a ABBOTT NUTRITION, an Illinois corporation,<br><br>Defendants. | Case No. SACV 10 1995 JVS (RZx)<br><br>**DECLARATION OF EDWARD R. FITZGERALD IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR REMAND**<br><br>Date: February 28, 2011<br>Time: 1:30 p.m.<br>Judge: James Selna<br><br>**Accompanying Documents**:<br>Memorandum of Law |

ABL/1067230/9188032v1

I, Edward R. Fitzgerald, declare as follows:

1.     I am an attorney with the law firm of Gordon & Rees LLP, counsel for the defendants Abbott Laboratories Inc. and Abbott Laboratories (collectively "Abbott") in the above-entitled action.  I am familiar with the matters set forth in this declaration based upon my own personal knowledge and my review of the files maintained for this case.  If called as a witness, I could and would competently testify to the following facts.

2.     Attached hereto as **Exhibit A** is a true and correct copy of the Court's October 19, 2010 Memorandum Order in *Kiely v. Abbott Laboratories Inc.*, Case No. 10-CV-694-MIS (N.D. Ill.).

3.     Attached hereto as **Exhibit B** is a true and correct copy of the transcript from the October 26, 2010 Court hearing in *Kiely v. Abbott Laboratories Inc.*, Case No. 10-CV-694-MIS (N.D. Ill.).

4.     Attached hereto as **Exhibit C** is a true and correct copy of the January 25, 2011 Declaration of Jeff Barton submitted in *Jovine v. Abbott Laboratories Inc., et al.*, Case No. 9:11-CV-80111-JIC.

Pursuant to Title 28 of the United States Code § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:     February 7, 2011          GORDON & REES LLP


By:    /s/ Edward R. Fitzgerald
Brian J. Mooney
Edward R. Fitzgerald

Attorneys for Defendants
Abbott Laboratories, Inc. and Abbott
Laboratories

1

# EXHIBIT  A

**EXHIBIT  A**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MARIA C. KIELY, etc.,           )
                                )
              Plaintiff,        )
                                )
     v.                         )    No.  10 C 6694
                                )
ABBOTT LABORATORIES, INC., etc.,)
et al.,                         )
                                )
              Defendants.       )

<u>MEMORANDUM ORDER</u>

     This Court has just received, by random assignment, the

action brought by Maria Kiely ("Kiely") as the representative

plaintiff in a putative class action against Abbott Laboratories,

Inc. and Abbott Laboratories (collectively "Abbott," treated

solely for convenience as a singular noun).  Because Kiely like

Abbott is an Illinois citizen, and because the Class Action

Complaint ("Complaint") has carved up a single "claim" in the

federal sense into nine state law counts,[1] Kiely's counsel seeks

to rely on CAFA (28 U.S.C. §1332(d)) to open the door to the

federal courthouse.

     Kiely charges Abbott with an undue delay of some six

_____

     [1]  This Court has frequently noted the inconsistency between
that approach to "counts," drawn from the state court concept of
"causes of action," and the provision of Fed. R. Civ. P. ("Rule")
10(b) that calls for separate counts only where more than one
"claim founded on a separate transaction or occurrence" is
involved-- something that is not the case here.  In that regard,
see <u>NAACP v. Am. Family Mut. Ins. Co.</u>, 978 F.2d 287, 291-93 (7th
Cir. 1992).  This memorandum order will not pause on that score,
however.

days--from its September 16, 2010 discovery of the possible

problem referred to hereafter to the September 22 recall of its

Similac infant products--as causing injury to the prospective

plaintiff class members (Complaint ¶43 proposes both (1) a

nationwide class of purchasers of Similac, a notion that seems

problematic in light of the Complaint's sole concentration on

Illinois law, and (2) a subclass limited to Illinois purchasers).

In support of the claimed damages to the class members, Complaint

¶16 quotes Abbott's September 22 public announcement:

> Abbott is recalling these products following an
> internal quality review, which detected the remote
> possibility of the presence of a small common beetle in
> the product produced in one production area in a single
> manufacturing facility.  The United States Food and
> Drug Administration (FDA) has determined that while the
> formula containing these beetles poses no immediate
> health risk, there is a possibility that infants who
> consume formula containing the beetles or their larvae
> could experience symptoms of gastrointestinal
> discomfort and refusal to eat as a result of small
> insect parts irritating the GI tract.  If these
> symptoms persist for more than a few days, a physician
> should be consulted.

It is frankly difficult to comprehend just how Kiely's

counsel, given the objective good faith demanded of every lawyer

under Rule 11(b) coupled with the plausibility requirement

imposed by the Supreme Court's Twombly-Iqbal duo, can assert that

the amount in controversy exceeds the $5 million floor necessary

to invoke CAFA.  At a minimum Kiely's counsel should be called

upon to expand on the ipse dixit assertions in the Complaint.

Accordingly this Court orders Kiely's counsel to appear at an

initial status hearing at 8:45 a.m. October 26, 2010 to address
that question, and a copy of this memorandum order is also being
transmitted to Abbott so that it may arrange for its counsel to
be present as well.

_____
Milton I. Shadur
Senior United States District Judge

Date:  October 19, 2010

3

# EXHIBIT B

**EXHIBIT B**

1           IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3    MARIA C. KEILY,                    )   No. 10 C 6694
                                        )
4                    Plaintiff,         )   Chicago, Illinois
                                        )   October 26, 2010
5                                       )   8:45 o'clock a.m.
     -vs-                               )
6                                       )
                                        )
7    ABBOTT LABORATORIES, INC. and      )
     ABBOTT LABORATORIES,               )
8                                       )
                     Defendants.        )
9

10           TRANSCRIPT OF PROCEEDINGS - STATUS
       BEFORE THE HONORABLE MILTON I. SHADUR
11
     APPEARANCES:
12
     For the Plaintiff:      EDELSON McGUIRE, LLC
13                           350 North LaSalle Street
                             Suite 1300
14                           Chicago, Illinois 60654
                             BY:  MR. JAY EDELSON
15                                MR. RAFEY S. BALABANIAN

16   For the Defendant:      PATTERSON BELKNAP WEBB & TYLER
                             1133 Avenue of the Americas
17                           New York, New York 10036
                             BY:  MR. JOHN D. WINTER
18                                    and
                             WINSTON & STRAWN LLP
19                           35 West Wacker Drive
                             Chicago, Illinois 60601
20                           BY:  MS. STEPHANIE S. McCALLUM

21

22

23   Court Reporter:         ROSEMARY SCARPELLI
                             219 South Dearborn Street
24                           Room 1412
                             Chicago, Illinois  60604
25                           (312) 435-5815

1          THE CLERK:  10 C 6694, Kiely versus Abbott Labs.

2          MR. EDELSON:  Good morning, your Honor, Jay Edelson

3   and Rafey Balibanian for the plaintiff.

4          MS. MCCALLUM:  Stephanie McCallum on behalf of the

5   Abbott defendants.

6          MR. WINTER:  John Winter on behalf of the Abbott

7   defendants.  Good morning, your Honor.

8          THE COURT:  Good morning.  I appreciate all of you

9   coming in because as my short memorandum order reflected, you

10  know, our first responsibility is always to double-check on

11  the existence of jurisdiction.  And when it comes to CAFA,

12  that -- particularly when it is coupled with a case -- a

13  couple of cases that are not the most popular in my court at

14  least, but I have to follow Twombly and Iqbal which requires

15  plausibility.  I was very much concerned when I read the

16  complaint and I see that, you know, you have a six-day period

17  of time in which Abbott assertedly was either negligent or

18  culpable in failing to have a recall of Similac and somehow

19  the -- were talked about a potential class claim of $5

20  million.

21          So what don't you help me with that, and then maybe

22  I will hear from Abbott.

23          MR. EDELSON:  Thank you, your Honor.  And I

24  appreciate you raising the threshold question.  Obviously, if

25  the Court doesn't have jurisdiction, it is in everyone's

1     interest to know that at the beginning.

2              THE COURT: Right.

3              MR. EDELSON: A few points. One is our underlying

4     allegation is not premised solely on Abbott's failure to act

5     quickly. We think it is clear that they waited at least six

6     days. We believe it is going to -- we are going to be able

7     to prove it is many more than six days. But still we think

8     the initial fact they sold baby food with beetles and beetle

9     larvae in it was negligent, and that is going to extend --

10             THE COURT: Well, I am going to assume that for the

11    present because it is alleged in the complaint, and I credit

12    what is said in the complaint. What I am really focusing on

13    more is quantification.

14             MR. EDELSON: Right.

15             THE COURT: I mean it is also -- I take into

16    account the fact that, you know, when it comes to asserted

17    delay, I would think that it would be the responsible thing

18    to do is to do what you have alleged they did, and that is

19    to go to the FDA and get confirmation or lack of confirmation

20    about whether you were dealing with a serious health problem

21    or not. So I am puzzled about the assertion of delay. But,

22    on the other hand, I will -- you know, I credit that for this

23    purpose.

24             You have got, it seems to me, two problems -- at

25    least two problems. One is that I have serious question

1   whether a national class is appropriate, given the fact that

2   you are relying on Illinois law. And then the related

3   problem is that if you are looking at Illinois potential

4   plaintiffs, the prospect of hitting the -- catching the brass

5   ring or catching the pot of gold at the end of the rainbow is

6   somewhat more remote in terms of numbers. So why don't you

7   focus on that.

8           MR. EDELSON: Of course. I will. There are a few

9   related points. First in terms of quantification, we allege

10  in the complaint, and we have a good-faith basis for this,

11  that this affected over a million people and over five

12  million tubs of the baby formula. That is Paragraph 20 and

13  Paragraph 20 -- 45 of the complaint. If you look --

14          THE COURT: Is that a million people in Illinois or

15  is that a million people nationally?

16          MR. EDELSON: Your Honor, with respect I will get

17  to the Illinois issue, which to me is separate.

18          THE COURT: Okay.

19          MR. EDELSON: But first figure out the overall

20  framework, which is how much nationally, and then whether it

21  makes sense at this stage, a week into the case, to already

22  decide we can't get a nationwide class, which I am happy to

23  deal with.

24          THE COURT: Yeah.

25          MR. EDELSON: The defendants have an 8-K that was

| 1 | put out September 8th, 2010 -- I may have the date wrong. I |
| 2 | apologize. September 22nd, 2010 where they said that they |
| 3 | were anticipating $100 million loss due to the sales returns |
| 4 | alone. When you are looking at defendant's own admissions |
| 5 | about the scope of the case, I think that that makes it |
| 6 | really clear we have a good-faith basis to think that there |
| 7 | are five million tubs implicated, over a million people |
| 8 | implicated, certainly well over five million. |
| 9 | Now let's get to the second part. |
| 10 | THE COURT: Wait a minute. What was contained in |
| 11 | the 8K loss from what, from recall? |
| 12 | MR. EDELSON: Just from the sales returns alone. |
| 13 | THE COURT: Of which product, this one? |
| 14 | MR. BALABANIAN: Of Similac. |
| 15 | MR. EDELSON: Correct, of this product, this |
| 16 | recall. This was -- this was a huge, huge recall. It is not |
| 17 | a small issue. |
| 18 | THE COURT: No, I understand. |
| 19 | MR. EDELSON: This is the type of thing where |
| 20 | Senator Harkin in Iowa said that this may be affecting the |
| 21 | ability for parents to find baby formula in America. Huge |
| 22 | recall. |
| 23 | THE COURT: Yeah. |
| 24 | MR. EDELSON: I mean there have been numerous |
| 25 | federal cases filed, and every other court has accepted |

1  jurisdiction. You have your own independent obligation, and

2  I accept that.

3  THE COURT: Of course, their potential loss is not

4  the same as potential recovery on the part of plaintiffs

5  because they may be swallowing -- that is a bad pun -- they

6  may be facing the prospect of pulling a lot more product back

7  in order to avoid future exposure. But the idea that somehow

8  that then correlates to what plaintiffs are entitled to

9  recover is a non sequitur.

10  MR. EDELSON: I -- I believe that it is not. That

11  is not the same. The idea it is a non sequitur I would

12  disagree with. Your Honor, the question is at this pleading

13  stage whether we have a good-faith basis to believe $5

14  million at issue. When we -- when we alleged that there were

15  five million tubs implicated, over a million people who are

16  part of the putative class, and their 8-K, which didn't

17  allege -- but the Court can take judicial notice of it --

18  mentions the $100 million number. And we can debate, you

19  know, whether, when we get into the actual discovery --

20  THE COURT: No, I am sorry, that is not debatable.

21  That is not debatable. To somehow correlate the cost to a

22  party of a recall which is -- which is essentially protective

23  of their view of the public good, okay, and that they are

24  swallowing a very, very large number in those terms does not

25  mean that there are people out there who are harmed to the --

1    to any extent that is somehow a -- necessarily a particular
2    fraction of that or even a major fraction of that.

3          Indeed, quite the contrary.  The very fact that
4    they -- that they ordered a recall makes it that much less
5    likely that you have got harms consequent because essentially
6    they have cut off all future harms by pulling the product.
7    And so it is -- again that is why I said it is a non
8    sequitur.  It doesn't follow.

9          MR. EDELSON:  Yeah.  With respect, that is -- that
10   is -- that is -- I understand the Court's view.  The reason
11   that we mentioned the $100 million figure would be, for
12   example, what if it were a trillion-dollar recall, that might
13   impact something.  If it were a million-dollar recall, that
14   would impact something.

15         My point was that this gives -- this gives a basis
16   for our allegation --

17         THE COURT:  You think it gives credence, and what I
18   am telling you is that you are dealing with a very different
19   apple and orange in those two items.

20         MR. EDELSON:  Your Honor -- your Honor, we are --
21   at this stage my view is you have got to look at the
22   allegations of the complaint.  If we say there are over five
23   million tubs implicated, if they are claiming that we don't
24   have a good-faith basis for it, they have -- they have
25   remedies.  They can file a Rule 11 motion.  They can do

1    whatever they want.  I don't think that is in dispute.  We --
2    if we say there is over a million people in the class and
3    over five million tubs implicated and over $5 million in
4    damage, I don't believe the 7th Circuit precedent says that
5    -- that the Court is allowed to speculate and say maybe that
6    we are not --

7           THE COURT:  I am sorry, I am not speculating, you
8    are the one who is speculating.  And, you know, I take -- I
9    take the responsibility very seriously in terms of the
10   threshold determination.  That is why I had you come in.  And
11   maybe I ought to hear from defense counsel because, you know,
12   they were on the firing line on this one.  Maybe you can help
13   me.

14          MR. WINTER:  Yes, your Honor.  Your Honor, we agree
15   with you on the question of the 12(b)(1) motion that we are
16   going to make on the claims as pled in this complaint.  I
17   think there is just a little nuance that we are going to have
18   to address with you.  Iqbal was a 12(b)(6) motion.  This is a
19   12(b)(1) motion.

20          THE COURT:  I understand that.

21          MR. WINTER:  And -- but I think the Supreme Court
22   precedents are all going to fall into place here.

23          You are 100 percent right on, you know, what
24   happened beginning on September 16th, which is a Thursday.
25   It is matter of public record.  On Sunday the company

1   realized the scope of an issue, called FDA on Monday to

2   determine how big a recall would be prudent.  And that is

3   executed by Tuesday.  And --

4               THE COURT:  It is a six-day spread.

5               MR. WINTER:  Six-day spread, including a weekend,

6   where everyone is being very, very -- you know, moving with

7   all due deliberate speed to understand the problem and then

8   take an appropriate action.  Yes, we recalled more than five

9   million tubs of this product because that is what we thought

10  was the appropriate thing to do.  But that, as you have

11  pointed out, Judge, doesn't translate into someone being able

12  to satisfy any of the prerequisites for this $5 million

13  damage claim, Judge.  It just -- it does not follow.  It is

14  just not plausible.

15              Everyone understands what could happen.  I mean it

16  is less than five in a million tubs that potentially have

17  this problem.  But everyone, FDA, the company, has looked at

18  this.  It is not a health hazard.  So you then look at a

19  situation and say, how can someone make out the $75,000.00

20  claim or the $5 million claim?  And we all know what the 7th

21  Circuit precedents are.

22              THE COURT:  Well, the 75,000 is really not in

23  play --

24              MR. WINTER:  Right.

25              THE COURT:  -- because we are dealing -- if you

1   were dealing with straight diversity, everybody agrees that

2   straight diversity would not exist. You have got an Illinois

3   citizen. You have got an Illinois company.

4              MR. WINTER: Right.

5              THE COURT: So that is not in it. I am really

6   looking at the global number.

7              MR. WINTER: And when we look at the global number,

8   is it plausible that they are going to be able to do that?

9   The answer is no because we have to look at 7th Circuit

10   precedent here on class certification and a lot of different

11   issues and the underlying issue which you have raised in your

12   order. And it is not just -- under Iqbal, Twombly, whatever

13   you want to look at, this is just not going to survive the

14   motion to dismiss which we are going to make.

15              THE COURT: Anyway, come back again to how you --

16   how you generate your numbers from -- by the way, as I read

17   the complaint, the complaint said that what had been

18   identified was a -- a single batch at a single facility. Is

19   that what happened?

20              MR. WINTER: That is -- it is a single line -- this

21   factory has multiple lines. It is a single line at a single

22   factory. And it was found in one batch on September 16th.

23   So what that led to is a much broader recall.

24              THE COURT: Okay. Counsel, I am still -- I confess

25   that I am still extremely troubled. I just don't see the

1    thing even beginning to approach what is needed to bring CAFA

2    into play. And what that means, I would think, is that, you

3    know, you may or may not be in a position to assert a

4    standard, you know, class action, but you may be required to

5    do that in a State Court of competent jurisdiction and you

6    can do battle there.

7         I have to guard the entrants to the federal

8    courthouse door. And so where did you get your number? You

9    are talking -- you have again talked about the scope in terms

10   of the protective measure that was taken. But I haven't

11   heard anything to relate that to prospective damages on the

12   part of the class as you have defined it --

13        MR. EDELSON: Your Honor --

14        THE COURT: -- or the classes, the class and

15   subclass.

16        MR. EDELSON: One thing, my personal belief is that

17   if there is a dispute about jurisdiction, it is something

18   which you err on the side of not finding jurisdiction because

19   the plaintiff does have other alternatives. You will not be

20   depriving our plaintiff or the putative class of a right to

21   pursue the case.

22        THE COURT: Oh, yeah, it would be, obviously,

23   dismissal without prejudice. No question about that.

24        MR. EDELSON: I understand. So as I am hearing

25   this, our concern is even if we were to convince you that

1    there is $5 million damages, which -- which I do believe

2    there are, it is --

3              THE COURT:  I will tell you what I think makes

4    sense:  Look, I think that on the basis of the -- of what we

5    have before us now, you really have not stated an effective

6    case for federal jurisdiction.  Now, you file a corresponding

7    lawsuit in the State Court system.  You engage in appropriate

8    discovery.  There may come a point at which it -- you are

9    able to establish, oh, yes, there is $5 million in

10   controversy, you know, that the -- if you look at 1440 --

11   1446 -- wait a minute.  Nope, wrong book.

12             I was thinking about whether Abbott might choose to

13   move this one to the federal system if that would emerge and

14   that would -- I suppose they could do that.  But in your case

15   it seems to me that if you establish the predicate for doing

16   it, I am just trying to think -- I don't know of any

17   provision under which a plaintiff can essentially remove --

18   and I haven't looked at the -- I haven't looked at the -- at

19   the CAFA provision on that.  Let me take --

20             MR. EDELSON:  Your Honor, there are none.  If we

21   amended --

22             THE COURT:  Under 1453.  Wait a minute.  Let me

23   take a look.  I don't think -- I don't think there are.  No,

24   I guess not.

25             Go ahead.

1    MR. EDELSON: Your Honor, our -- the one concern
2    which I would like to raise is we would feel it would be very
3    unfortunate and we would think that it would not be in
4    keeping with -- with everyone's duties as officers of the
5    Court if we filed in State Court and then there was a removal
6    motion. All we are trying to do is avoid a fight about which
7    court it ought to be in. I think defense counsel's
8    statements on the record are clear.

9    They did make a couple comments I would just want
10   to respond to on the record. They seem to suggest whether we
11   can get class classification or whether we can survive a
12   motion to dismiss bears on whether the Court has
13   jurisdiction. I do not believe that is the law. The law is
14   whether we alleged sufficient facts.

15   THE COURT: Right.

16   MR. EDELSON: And so with that standard, defendant
17   saying it is not plausible for us to claim that there is five
18   million at issue, your Honor seems to think they have got the
19   better argument -- and we respect that -- so we -- we are
20   happy to voluntarily dismiss or just let your Honor dismiss
21   the case and we will file in State Court.

22   THE COURT: All right. So the dismissal is without
23   prejudice, obviously. And that means that you are -- that
24   they are fair game for you. And I will tell you, I wonder
25   whether both parties -- well, that would be too fancy. Okay.

1    I will treat it as a -- as a dismissal without prejudice.

2         And I really appreciate both sides coming in and

3    being geared up for this one because, as I say, the problem

4    sort of jumped off the page for me when I read the complaint

5    and I felt it was in both sides' interest to tee it up to get

6    a response from you.

7         MR. EDELSON:  Thank you for flagging the issue.

8         MR. WINTER:  Thank you, Judge.  Appreciate it.

9         MR. EDELSON:  Appreciate it, your Honor.

10        (Which were all the proceedings heard.)

11                        CERTIFICATE

12        I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    s/Rosemary Scarpelli/          Date:  October 26, 2010

16

17

18

19

20

21

22

23

24

25

# EXHIBIT   C

**EXHIBIT   C**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| JASON JOVINE, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. _____ |
| | ) | State Case No. 50 2010 CA 029178 |
| ABBOTT LABORATORIES, INC. d/b/a ABBOTT SALES, MARKETING and DISTRIBUTION CO., a Delaware corporation, and ABBOTT LABORATORIES d/b/a ABBOTT NUTRITION, an Illinois corporation, | ) ) ) ) ) ) ) | **CLASS ACTION** |
| Defendants. | ) ) ) | |

## DECLARATION OF JEFF BARTON

Pursuant to 28 U.S.C. § 1746, the undersigned states as follows:

1.      My name is Jeff Barton.  I am sui juris, over the age of 21, have personal knowledge of the facts stated in this Declaration, and if sworn as a witness, can testify to these facts.

2.      I am employed by Abbott Laboratories d/b/a Abbott Nutrition ("Abbott"), which has been named as a defendant in the above-captioned proceeding.

3.      My title is Division Vice President and Controller, Finance, Abbott Nutrition Products Division.

4.      I have been employed by Abbott since August 13, 1990.  I am authorized to execute this Declaration on behalf of Abbott.

5.      As Division Vice President and Controller, Finance, I am familiar with Abbott's business operations regarding its sales of Similac-brand powdered infant formula products.

6.     In September 2010, Abbott initiated a proactive, voluntary recall of approximately five million containers of certain Similac-brand infant formula products distributed between November 2007 and September 2010.

7.     Abbott has offered, and continues to offer, consumers who purchased any recalled product, whether used or unused, the option of returning the recalled product to their place of purchase for a full refund of the purchase price or returning the recalled product directly to Abbott for a full refund at no cost to the consumer.

8.     As of January 11, 2011, more than 100,000 separate households had returned containers of product directly to Abbott pursuant to this recall.

9.     As of January 11, 2011, the purchasers of these returned products had filed refund claims with Abbott in the amount of $5,911,391.

10.     As of January 11, 2011, the purchase price for each unit of recalled product for which a refund has been sought, according to customers submitting refund claims, ranges from $3.00 to $29.99. As of January 11, 2011, the average purchase price of all units of recalled product which have been returned, according to customers submitting refund claims, is $20.13.

11.     An unknown additional number of consumers returned recalled product to retailers, who, in turn, returned the product to Abbott for a refund. Abbott is not aware of the portion of refunds it has paid to retailers that correspond to product which had been returned to the retailer by a consumer (as opposed to product that the retailer had never sold).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 25, 2011, at Columbus, Ohio.

_____

Jeff Barton

- 2 -

Division Vice President and Controller, Finance,
Abbott Nutrition Products Division.

- 3 -